# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-3878

_____

United States of America,

        Appellee,

v.

Peter George Noe,

        Appellant.

_____

No. 03-3879

_____

United States of America,

        Appellee,

v.

Timothy James Schultz,

        Appellant.

_____

No. 03-3880

_____

United States of America,

        Appellee,

\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeals from the United States
District Court for the
District of Minnesota.

\*
\*
\*
\*
\*
\*
\*
\*
\*

\*
\*
\*

|                          |     |
|--------------------------|-----|
| v.                       | *   |
|                          | *   |
|                          | *   |
| Amy Marie Placek,        | *   |
|                          | *   |
| Appellant.               | *   |

_____

No. 03-4048

_____

|                              |     |
|------------------------------|-----|
| United States of America,    | *   |
|                              | *   |
| Appellee,                    | *   |
|                              | *   |
|                              | *   |
| v.                           | *   |
|                              | *   |
| Terry Lynn Bauman,           | *   |
|                              | *   |
| Appellant.                   | *   |

_____

Submitted:  November 15, 2004
Filed:  June 9, 2005

_____

Before WOLLMAN, HEANEY, and FAGG, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury found Peter Noe guilty of conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846, and 851, and conspiring to distribute marijuana in violation of 21 U.S.C. §§ 841(b)(1)(B), 846, and 851. Noe was tried jointly with Timothy Schultz, who was found by the jury to be guilty of conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846,

-2-

and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(b)(1)(B). The district court[1] sentenced Noe and Schultz to 480 months' imprisonment. Amy Placek and Terry Bauman, members of the same conspiracy, pleaded guilty and received sentences of 57 and 100 months, respectively. All four defendants appeal, asserting a variety of grounds for reversal. Noe and Schultz seek new trials and in addition raise several sentencing claims. Placek and Bauman seek resentencing. We affirm.

## I. Background

Noe and Schultz headed a methamphetamine conspiracy in Austin, Minnesota, from 2000 to 2002. Noe dealt marijuana on the side. Placek and Bauman participated in the conspiracy, and a number of other individuals served as sub-dealers. Others transported, mailed, received, and otherwise facilitated the flow of drugs, which emanated from Californian sources. One such individual was Jessica Taft, who began receiving packages of methamphetamine from Schultz before her eighteenth birthday. The group specialized in a powerful form of methamphetamine known as glass.

In 1999, a police raid on a house inhabited by Noe and Schultz yielded several loaded handguns, approximately 32 pounds of marijuana, and approximately $28,700 in cash. Noe was in and out of jail for various offenses until August of 2001. In April 2002, Police raided a hotel room occupied by Noe, discovering more drugs and cash. During his re-incarceration, despite posted notice that phone calls were subject to monitoring, Noe made references during phone conversations to drug orders, particular firearms, and even his confidence that he could best the police and the federal government. In speaking with his grandmother from the jail phone, Noe noted, "It's all a big *ss game with the cops because they f*cked with me…they drew

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

the line in the sand." His grandmother replied, "Let me tell you about that line in the sand, Peter. They've got…a lot of stuff on their side and don't get yourself blown away." Noe responded, "Yeah well I've got guns too" and went on voicing his confidence: "I'm above the law…Grandma, the federal government got involved and they can't even catch me."

The raids and ongoing investigations necessitated careful storage of the drugs, which led Noe and Schultz to rely on Placek and Bauman. Bauman, for example, kept a safe in his basement where he stored methamphetamine at Schultz's behest. At times, however, managing the underlings of the conspiracy proved difficult. On one occasion, a sub-dealer named Keith Price took three ounces of Schultz's methamphetamine and failed to pay the $10,000 that Schultz requested for it. Placek lured Price to her house, where Schultz ambushed him, beat him, broke two of his teeth, and removed another tooth with pliers. At the end of this ill-fated encounter, Schultz told Price that he owed him only $5,000.

Bobby Sea, Schultz's counsel, cross-examined Price, who had testified to the pliers incident on direct examination. Sea began by establishing that, prior to meeting Schultz, Price used marijuana, had driven and crashed a car under the influence of alcohol, and had vandalized police cars. Sea then went on to cross-examine Price regarding the substantive matters about which Price had testified on direct examination. On redirect examination, the prosecutor referred to Sea's question about vandalizing police cars and inquired whether somebody had asked Price to do this. Price replied that Noe had asked him to do it. The prosecutor continued: "And what did he want you to do to [the police cars]?" Price's response: "He said he'd give us a hundred dollars if we wrote I.E. Wood on each cop car." When asked the meaning of "I.E. Wood," Price answered, "In the Empire of Wood or [a] white supremacist gang." The prosecutor then asked who belonged to that gang and Price replied, "Pete [Noe] and Tim [Schultz], as far as I know." The court later instructed the jury to disregard the testimony about I.E. Wood.

On appeal, Noe contends that the district court erred by admitting evidence that he was a member of a white supremacist gang and by denying his motion to sever his trial from that of Schultz. Schultz joins in Noe's first contention and further contends that the district court erred by admitting evidence of his assault on Price. Schultz also asserts that the district court erred by enhancing his sentence for use of a minor, possession of a firearm, and for his role as an organizer or leader. In addition, Noe and Schultz filed motions to remand their cases for resentencing in light of Blakely v. Washington, 124 S. Ct. 2531 (2004).

Placek pleaded guilty pursuant to a plea agreement that required her to testify fully and truthfully against her co-defendants. Subsequent to making this agreement, however, Placek telephoned Noe and reassured him that despite the plea agreement she was "trying not to do anything that's gonna f*ck with everybody's life," and that she could "discredit" Eric Borg, one of the government's witnesses. She also told Noe that the government "probably won't want me to [testify] because I changed my story every time I talk to 'em." At a meeting with the government one week before Schultz's and Noe's trial, Placek changed her story in a way consistent with her promise to Noe. The prosecutor decided not to use Placek as a witness at trial and, citing her telephone conversation with Noe and her evasiveness at the meeting, decided not to make a downward departure motion on her behalf at sentencing. The district court found that Placek's attempts at the evidentiary hearing to explain away her exchange with Noe were "flat and blatant lies." On appeal, Placek claims that the government violated its duty under Rule 16 of the Federal Rules of Criminal Procedure to disclose the evidence concerning her statements that it used as a basis for refusing to file a § 5K1.1 downward departure motion at sentencing. She claims that this lack of disclosure resulted in the denial of her Sixth Amendment right to counsel and that the government acted in bad faith when it declined to file the downward departure motion.

After pleading guilty to methamphetamine trafficking charges, Bauman testified against Noe and Schultz at trial. The district court granted the government's § 5K1.1 downward departure motion and sentenced Bauman to 100 months' imprisonment, a term substantially lower than the applicable Guidelines range of 188-235 months. On appeal, Bauman claims that the district court abused its discretion by declining to sentence him to less than 100 months' imprisonment. We dispose of his claim here: Bauman did in fact receive a substantial downward departure in his sentence and "[i]n this circuit, the extent of a district court's downward departure is not reviewable." United States v. McCarthy, 97 F.3d 1562, 1577 (8th Cir. 1996).

## II. Gang-Related Testimony

Noe and Schultz argue that it was reversible error for the court to admit evidence of their membership in a white supremacist gang. Because defense counsel did not object to the admission of the evidence at trial, we review for plain error. United States v. Whitetail, 956 F.2d 857, 861 (8th Cir. 1992).

As described above, it was Noe's counsel, Sea, who first asked Price about vandalizing police cars. The government then delved into the topic on redirect examination, causing Price to disclose that Noe had asked him to vandalize the police cars by spraypainting the name of a gang on them. Sea objected to the relevance of the prosecutor's questions only when the government began to inquire more broadly into vandalism in the Austin area, whereupon the prosecutor withdrew the question. The evidence of Noe and Schultz's membership in the gang, however, had already been admitted without objection on relevancy grounds.

When Price said that Noe and Schultz belonged to the gang, Albert Garcia, counsel to Noe, objected only on the ground that the testimony was speculative. The court sustained the objection, instructing the government to lay some foundation. The prosecutor then asked Price how he knew of their membership in the gang, and Price replied that Noe and Schultz had the name of the gang tattooed on their bodies.

-6-

Attorney Garcia returned to the subject on re-cross examination, attempting to show that Noe was not sincere in his request that Price spraypaint the name of the gang on the police cars. Soon thereafter, the court addressed the jury, instructing it in regard to the "testimony concerning an organization or something of that nature" as follows: "You will not consider that as part of the evidence against the defendants on the subject of whether or not they have committed or not committed the crimes that are charged in the indictment. Do you understand that? So I'm striking that or making it clear that that is not evidence of the substantive crimes with which the defendants are charged in this case, okay." Tr. at 131-32.

Sea's relevance objection did not come when the prosecutor asked Price what he had been instructed to do with the police cars. Nor did it come when the prosecutor asked Price to explain the meaning of "I.E. Wood." His only objection at this stage went to Price's basis of knowledge, and thus he did not raise a Fed. R. Evid. 403 objection to the evidence. Moreover, Sea opened the door to the topic by introducing the topic of Price's vandalizing. "It is fundamental that where the defendant 'opened the door' and 'invited error' there can be no reversible error." United States v. Steele, 610 F.2d 504, 505 (8th Cir. 1979). "We have allowed the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on cross-examination." United States v. Beason, 220 F.3d 964, 968 (8th Cir. 2000). The government's questioning of Price on redirect examination established that Noe had encouraged the vandalism and that the vandalism had nothing to do with Price's own agenda. This questioning clarified the issue of Price's credibility by showing that his unsavory acts were motivated by orders from Noe and Schultz.

Thus, we find no improper conduct on the government's part in pursuing the foregoing line of questioning. In any event, even if we found that the questioning delved into irrelevant matters, we would not reverse unless we were persuaded that the questioning probably prejudiced the defendant and that the district court took no action to eliminate any prejudice flowing from the questions. Keeble v. United

<u>States</u>, 347 F.2d 951, 956 (8th Cir. 1965), <u>cert. denied</u>, 382 U.S. 940 (1965). In light of the substantial evidence against the appellants and the court's limiting instruction, to which no objection was raised, we conclude that no reversible error occurred.

### III. Failure to Sever

Noe contends that the district court erred in denying his motion to sever his trial from Schultz's trial. "A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown." <u>United States v. Pherigo</u>, 327 F.3d 690, 693 (8th Cir. 2003). Severance is not required "simply because the evidence may have been more damaging against one appellant than the others." <u>United States v. Garcia</u>, 785 F.2d 214, 220 (8th Cir. 1986). Our strong presumption against severing properly joined cases, <u>see, e.g.</u>, <u>United States v. Delpit</u> 94 F.3d 1134 (8th Cir. 1996), is consistent with the goal of achieving a correct outcome. <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993) (joint trials "avoid[ ] the scandal and inequity of inconsistent verdicts"); <u>United States v. Darden</u>, 70 F.3d 1507, 1528 (8th Cir. 1995) ("[A] joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome"). Severance does, however, become necessary "where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants." <u>United States v. Jackson</u>, 549 F.2d 517, 525 (8th Cir. 1977).

Noe alleges that the prosecutor made "no effort to separate the violent acts of Mr. Schultz from Mr. Noe." He further alleges that the strength of the evidence of his involvement in the conspiracy was surpassed by the strength of the evidence of Schultz's involvement and that there is a significant chance that the jury attributed Schultz's violent behavior to Noe. Even if we were to accept Noe's argument about the disparity between the strength of the evidence presented against him and that presented against Schultz, severance would not be warranted. <u>See</u> <u>Garcia</u>, 785 F.2d at 220. To support his claim of attributed violent behavior, Noe refers to the prosecutor's choice of words in a sentence uttered during closing arguments: "that's

just one example of the willingness of these people to use violence." Tr. at 563. We reject Noe's assertion that this statement prevented the jury from properly compartmentalizing the evidence. There was never any question as to which of the two defendants brutalized Price. The prosecution made no attempt to blur the evidence regarding particular instances of violence, referring to Schultz numerous times as the perpetrator. Moreover, the complained-of reference to "these people" is not misleading: violent acts were perpetrated in furtherance of the conspiracy, which was headed by Noe and Schultz. Although Noe did not perpetrate the violence, he benefitted from it and, given his complicity in the conspiracy and his collection of handguns in the places linked to the conspiracy, he did in fact evince a willingness to use violence. We have noted that "[r]arely, if ever, will it be improper for co-conspirators to be tried together," United States v. Drew, 894 F.2d 965, 968 (8th Cir. 1990), and we find nothing in the facts of this case to warrant an exception to this rule.

## IV. Evidence of Assault

Schultz maintains that the evidence of his assault on Price should have been excluded as unduly prejudicial under Rule 403 of the Federal Rules of Evidence. We review for abuse of discretion the district court's denial of Schultz's *in limine* motion to exclude the evidence. See Countrywide Servs. Corp. v. SIA Ins. Co., 235 F.3d 390, 394 (8th Cir. 2000).

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Schultz suggests that the evidence of his assault on Price had little relevance, since he was charged with drug offenses, rather than battery, and he asserts that in any event the graphic nature of the evidence was highly prejudicial. The fact remains, however, that Schultz's violent acts were directed at someone who took drugs from him without paying for them. Schultz intended to coerce payment of the drug debt, and thus his actions furthered the conspiracy whose existence the government set out to prove.

"[E]vidence of violent acts committed by conspirators during and in relation to the conspiracy are direct evidence of the conspiracy and are therefore admissible." United States v. Maynie, 257 F.3d 908, 916 (8th Cir. 2001).

As to the question whether this evidence, though relevant, presented too great a danger of prejudice, we consider "the degree of unfairness of the prejudicial evidence and whether it tends to support a decision on an improper basis." United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997). Schultz's use of violence underscored to Price and others in the conspiracy the seriousness of the business and the consequences of disloyalty. It was highly probative of the conspiracy itself and Schultz's leadership role within it. Although doubtless graphic, the pliers incident evidence was not so inflammatory as to mandate a finding that it was so unfair and had such a tendency to support a decision on an improper basis that the district court abused its discretion in admitting it. In a word, the danger of unfair prejudice arising from this evidence did not substantially outweigh its probative value, as is evident from our holdings in similar cases. See id. at 730-31 (upholding the admission of evidence of the brutal murder of a member of a drug conspiracy, as it related to the maintenance of control of the conspiracy); United States. v. Johnson, 169 F.3d 1092, 1096-97 (8th Cir. 1999) (upholding the admission of evidence of the rape and beating of a member of the conspiracy as relevant to establishing the defendants' drug collection methods and enforcement of rules in furtherance of the conspiracy).

## V. Constitutionality of the Sentences

We turn to the question whether Noe's and Schultz's sentences survive Sixth Amendment challenge. United States v. Booker, 125 S. Ct. 738, 766 (2005), requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. The enhancements applied by the district court, and the mandatory application of the guidelines to Noe and Schultz compel a

conclusion that <u>Booker</u> error occurred. Because neither Noe nor Schultz entered a pertinent objection to his sentence, we review for plain error. <u>United States v. Pirani</u>, No.03-2871, slip op. at 7 (8th Cir. Apr. 29, 2005).

Plain error review proceeds under the four-part test of <u>United States v. Olano</u>, 507 U.S. 725 (1993). Noe's and Schultz's claims fail the third part of the test. In order to show that the error affected substantial rights, they must show a reasonable probability based on the record as a whole that but for the mandatory application of the guidelines they would have received a lesser sentence. <u>Pirani</u>, slip op. at 11. Nothing in the record suggests that they would have received a lesser sentence if the district court had known that the guidelines were merely advisory. Even under the mandatory regime in effect at the time of sentencing, the district court could have sentenced Noe and Schultz to lesser sentences of 360 months' imprisonment under the guidelines even after applying the enhancements. That the district court imposed sentences well in excess of the minimum guidelines range forecloses any plausible contention that a merely advisory guidelines regime would probably have resulted in lesser sentences.

## VI. Application of the Sentencing Guidelines

Schultz claims that the district court erroneously applied three enhancements to his sentence under the United States Sentencing Guidelines: § 3B1.4 for use of a minor; § 2D1.1(b)(1) for possession of a firearm; and § 3B1.1(a) for being an organizer or leader. We review the district court's factual findings for clear error, and its interpretation and application of the guidelines *de novo*. <u>United States v. Mashek</u>, No. 04-2560, slip op. at 6, 7-8 (8th Cir. May 10, 2005). <u>See</u> <u>also</u> <u>United States v. Mathijssen</u>, No. 04-1995 (8th Cir. May 2, 2005). "If we determine that the district court correctly calculated the applicable guidelines range, we then reach the second step of our analysis, a review of any challenge to the reasonableness of the sentence in light of [18 U.S.C.] § 3553(a)." <u>Mashek</u>, slip op. at 8.

-11-

**A.**

Schultz does not contest that he involved a minor, Jessica Taft, in the drug conspiracy. Rather, he suggests that § 3B1.4 should not apply to him since he used Taft as a courier before he, Schultz, reached age twenty-one. The record suggests that Schultz did begin using Taft before he turned twenty-one years old; however, Taft also testified that she served as a courier for Schultz in October of 2002, after Schultz turned twenty-one. If Taft is believed, then there is nothing to decide. If Taft is not to be believed, United States v. Ramirez, 376 F.3d 785 (8th Cir. 2004), disposes of Schultz's claim. See id. at 787-88 (holding that the § 3B1.4 enhancement was properly applied to a defendant who was nineteen at the time of the relevant events).

**B.**

Schultz claims that his possession of a firearm was not proven by a preponderance of the evidence and that even if possession were proven, the district court erred by not finding it "clearly improbable that the weapon had a nexus to criminal activity." The government has the burden at sentencing of showing by a preponderance of the evidence that a firearm was present and that it was not clearly improbable that the weapon had a nexus with the criminal activity. United States. v. Betz, 82 F.3d 205, 210 (8th Cir. 1996); U.S.S.G. § 2D1.1(b)(1).

Borg testified that he helped build a safe in Bauman's wall to hold Schultz's drugs and firearms, and Price testified that Schultz owned several guns and that he once helped Schultz send one via mail to California. Firearms were recovered in December of 1999 from Schultz and Noe's residence, and the evidence of Noe's possession of firearms in relation to the drug offenses was unequivocal. The conspiracy at issue began in 2000, and thus we do not take into account the guns recovered from the residence in 1999. "[A]ny enhancement for possession of a firearm requires proof that the firearm was present during the drug offense." United States v. Johnson, 260 F.3d 919, 922 (8th Cir. 2001). The district court also noted

that Schultz was responsible for the reasonably foreseeable activities of his co-defendant. The issue, however, is not whether Noe possessed firearms, but rather whether Schultz was shown to possess firearms. Although Schultz is responsible for certain activities of his co-defendant, his sentence cannot be enhanced for firearm possession on the sole basis that his co-defendant possessed firearms. Therefore, the validity of the enhancement depends on the trial testimony of Borg and Price.

The government was required to establish that Schultz possessed a firearm and that a nexus existed between that firearm and the offenses of which Schultz was convicted. See Betz, 82 F.3d at 210. If the testimony of Borg and Price is accepted as proof of possession, the nexus follows, as their testimony related to the drug conspiracy and not to other activities in relation to which one might use a firearm. Credible and substantial testimony by an accomplice is sufficient to support a conviction, United States v. Tucker, 169 F.3d 1115, 1119 (8th Cir. 1999), and can prove firearm possession under the preponderance of the evidence standard. Chesney v. United States, 367 F.3d 1055, 1060 (8th Cir. 2004). Based on the mutually reinforcing testimony of Borg and Price, we conclude that the district court did not clearly err in applying the enhancement.

## C.

Schultz contends that he was a manager or supervisor and not a leader or organizer. He argues that Noe was responsible for a greater share of the criminal activity and that evidence of Noe's firearm possession far surpassed the evidence presented about his own involvement with firearms. Even if true, these allegations do not advance his claim. The four-level role enhancement under U.S.S.G. § 3B1.1(a) flows from the defendant's decision-making authority, type of participation in the offense, nature and scope of the crime, and the degree of control or authority over others. Id. at application n. 4; United States v. Logan, 54 F.3d 452, 456 (8th Cir. 1995). "We have never construed the terms ['organizer' and 'leader']

-13-

so narrowly as to restrict application of the enhancement solely to the organizer who first instigated the criminal activity. We have held that a defendant need not be found to be the only organizer or leader, and he need not have been the organizer or leader of all of the participants." United States v. Lashley, 251 F.3d 706, 712 (8th Cir. 2001). Significant evidence presented at trial suggested that Schultz controlled others in the conspiracy and supplied drugs to lower level dealers. Accordingly, the district court did not abuse its discretion in enhancing his sentence under § 3B1.1(a). See id. ("A defendant can be an organizer or leader within the meaning of this guideline by supplying drugs to others without directly controlling other participants in the conspiracy").

Having determined that the district court correctly calculated the applicable guidelines range, we proceed to review whether the sentence was reasonable in light of 18 U.S.C. § 3553(a). See Mashek, slip op. at 8; Booker, 125 S. Ct. at 766 (Breyer, J.) ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable"). Having reviewed the presentence report in light of the factors comprising § 3553(a), we note that Schultz's sentence falls within the applicable guidelines range of 360 months to life in prison. We also note that the nature and circumstances of his offense and the need for the sentence imposed to reflect the seriousness of his offense, afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant all support the sentence he received. See § 3553(a)(1-4).

The reasoning and conclusion in the foregoing reasonableness analysis applies to Noe's sentence as well, and thus we need not discuss further his challenge to the sentence.

-14-

## VII.  Placek's Claims

### A.

Placek first claims that the government violated Rule 16(c) of the Federal Rules of Criminal Procedure by not providing her with a transcript of her own telephone conversation with Noe.  Rule 16(c) specifies that "A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court."  Placek pleaded guilty a month before making the statement, thus dispensing with her trial and rendering her a nonparty.  Moreover, Placek herself was the author of the statement of which she complains.  We reject this ground for appeal.

### B.

Pointing to her meeting with the government one week prior to the trial, Placek next claims that the government's decision not to provide her attorney with a transcript at that time of her conversation with Noe constituted a denial of counsel in violation of the Sixth Amendment.  Placek contends that had her attorney received notice of this evidence at that time, he would have attended the meeting.  Her attorney was aware of the meeting, however, and of the fact that the date of trial was rapidly approaching.  The government did nothing to discourage his attendance and did not, in fact, confront Placek with the evidence at this meeting.  Placek states that "the government's lack of candor and failure to disclose [her] statement depleted [her] waiver of any intelligent [sic] or voluntariness which were essential to a valid waiver of her right to counsel."  She goes on to note that the "intercepted telephone conversation was certainly a concern for the government that [she] was not truly willing to cooperate [sic] but yet [her] own counsel was kept in the dark that [her] conduct potentially jeopardized her sentencing options."  Citing United States. v. Leonti, 326 F.3d 1111 (9th Cir. 2003), Placek claims that the "period of time between a guilty plea and sentencing…is a critical stage in a criminal proceeding during which a defendant is entitled to the assistance of counsel."  Leonti states that "[a] critical

stage is a 'trial-like confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice.'" Id. at 1117 (listing post-indictment police lineups, arraignments, and sentencing as examples). Placek had neither a right to a downward departure motion at trial nor a right to testify on the government's behalf. The government had no duty to inform her counsel on an ongoing basis of the instances of Placek's own behavior that it was considering in the exercise of its own discretion as to whether she would be a witness at trial. If anyone had the duty to keep her counsel informed of conduct that may have jeopardized her sentencing options, it was Placek herself. The Sixth Amendment does not require the government to disclose to counsel the details of their client's malfeasance so that the client can devise with impunity strategies to conceal her actions. In any event, the government did disclose the evidence in question to Placek's counsel prior to sentencing, and the court held an evidentiary hearing at which Placek and her counsel unsuccessfully challenged the government's grounds for not filing the downward departure motion.

## C.

Placek's claim that the government acted in bad faith when it declined to file a departure motion under § 5K1.1 is also without merit. The plea agreement provides that "the government, not the Court, will decide whether the defendant has rendered substantial assistance." "A plea agreement in which the government specifically retains its discretion under § 5K1.1 will defeat a motion to compel unless the defendant is able to show unconstitutional motive or bad faith." United States v. McClure, 338 F.3d 847, 850 (8th Cir. 2003). Placek alleges no unconstitutional motives on the government's part for failing to file such a motion, such as racial or religious persecution, see Wade v. United States, 504 U.S. 181, 185-86 (1992), and our review of the record does not suggest any impermissible grounds for the government's decision not to file a downward departure motion.

## VIII.  Conclusion

The sentences of all four appellants are affirmed.

_____